# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| **RAMON ALVARADO, JR.,**<br>    **Plaintiff,**<br>    v.<br><br>**TEANA JACKSON, JULIO ITHER,**<br>**and MICHAEL STEVENS,**<br>    **Defendants.** | **Case No. 19-C-194** |

## <u>DECISION AND ORDER</u>

Plaintiff Ramon Alvarado, Jr., a Wisconsin state prisoner who is representing himself, is proceeding with two lawsuits under 42 U.S.C. § 1983, which were previously consolidated. ECF No. 57. He alleges that (1) officers used excessive force and failed to protect him, and (2) a lieutenant denied him due process related to a disciplinary hearing, violating his rights under the Fourteenth Amendment. He also alleges state-law violations. The defendants now move for summary judgment. As explained below, the motion is **GRANTED in part** and **DENIED in part**.

## I. BACKGROUND[1]

### A. The Parties

The plaintiff has been incarcerated in Department of Corrections facilities since December 2014. ECF No. 83, ¶ 1. As of April 2015, he was a prisoner at Waupun Correctional Institution. *Id.*; ECF No. 94, ¶ 1. During the events underlying this lawsuit, however, he was a pretrial detainee at the Milwaukee County Jail ("Jail") awaiting trial for allegedly spitting on an officer. ECF No. 83, ¶ 11; ECF No. 94, ¶ 11. He sues corrections

---

[1] Facts in this section are taken from the parties' proposed findings of fact and declarations in support. ECF Nos. 83–89, 94–96, 99, 101 & 104–05. I will consider the parties' proposed facts only to the extent they are supported by evidence in the record and will consider arguments in the supporting memoranda only to the extent they properly refer to the proposed facts. *See* Fed. R. Civ. Pro. 56(c)(1); Civil L. R. 56(b)(1)(C)(i) and (b)(6). I will deem admitted any facts that the parties do not properly contest by referencing evidence in the record. *See* Civil L. R. 56(b)(4); *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003) ("We have consistently held that a failure to respond by the nonmovant as mandated by the local rules results in an admission.").

officers Teana Jackson and Julio Ithier and Lieutenant Michael Stevens, all of whom worked at the Jail. ECF No. 83, ¶¶ 2–4.

**B.    The Plaintiff's History at the Jail**

On January 10, 2018, the plaintiff was moved from suicide watch to pod 6A, a general population housing unit. ECF No. 83, ¶¶ 12–13. The only separation between inmates and the single officer who is staffed in pod 6A is a red line of tape on the floor near the officer's workstation, which the inmates are ordered to stay behind. *Id.*, ¶ 14. According to Jackson, officers take disciplinary violations "very seriously" because inmates greatly outnumber the officer. *Id.*, ¶¶ 13–15; ECF No. 87, ¶ 6.

The plaintiff was disciplined for three rule violations on January 29, February 3, and February 7, 2018. ECF No. 83, ¶¶ 16–18. He received a 23-hour lock in for each violation. *Id.* Jackson believed she had a good rapport with the plaintiff, despite his behavior issues. *Id.*, ¶ 19; ECF No. 87, ¶¶ 7 & 60. She briefly allowed him to be her "pod worker" and says she tried to look out for him because other inmates did not like him. ECF No. 83, ¶ 20; ECF No. 87, ¶ 7. She says she had no negative interactions with him before February 9, 2018. ECF No. 83, ¶ 23; ECF No. 87, ¶¶ 60–61. The plaintiff says he did not have a good rapport with Jackson. ECF No. 94, ¶ 19; ECF No. 96, ¶ 7. He testified at his deposition that Jackson took away his pod worker position in late January or early February 2018 for "[n]o reason at all." ECF No. 89-1 at 22:24–23:5. He now asserts that she took away that position because of his charges for spitting on another officer. ECF No. 94, ¶ 21. He testified that he was upset when Jackson took away his pod worker position because he believed it was disrespectful, and respect is important to him. ECF No. 83, ¶ 22; ECF No. 89-1 at 34:22–35:10.

**C.    The February 9, 2018 Incident**

**1.    Pre-Incident Events**

On February 9, 2018, Jackson was the officer assigned to monitor the inmates in pod 6A. ECF No. 83, ¶ 24. That morning, she ordered the inmates to lock in so she could conduct an inspection and take her lunch break. *Id.*, ¶ 25. Jackson saw the plaintiff staring through the gym window making hand gestures. *Id.*, ¶ 27. The plaintiff testified that he was

communicating with another officer who had a dog with him. ECF No. 89-1 at 26:1–13. Jackson told the plaintiff to stop making gestures and ordered him to lock in. ECF No. 83, ¶ 27. The plaintiff ignored Jackson's command and, according to his testimony, "said some words like fuck that." *Id.*, ¶ 28; ECF No. 89-1 at 30:17–19. The plaintiff's insubordination and hand gestures violated the Jail's rules as stated in the Inmate Handbook, a copy of which the plaintiff testified he received in January 2018. ECF No. 83, ¶ 28; ECF No. 88, ¶ 8; ECF No. 89-1 at 103:1–4.[2] These violations can be punished with a full 23-hour lock in, but Jackson intended on imposing a lighter punishment because of her believed rapport with the plaintiff. ECF No. 83, ¶ 29; ECF No. 87, ¶ 13. But the plaintiff became upset and called Jackson "a bitch," so she imposed the full 23-hour lock in punishment. ECF No. 83, ¶ 30; ECF No. 87, ¶ 14. The plaintiff in his testimony described this exchange as a "heated argument." ECF No. 89-1 at 31:11–13. He testified that "out of spite," he refused to lock himself in and told Jackson, "Lock me in yourself." *Id.* at 31:12–13, 32:19–20.

Jackson states the plaintiff went into his cell (cell #34) without issue, but once inside he began yelling obscenities, including "Fuck you bitch" and "I'm going to bust you in your shit." ECF No. 83, ¶¶ 31–32; ECF No. 87, ¶ 15. Jackson believed the plaintiff was merely blowing off steam, that maybe he was having a bad day. ECF No. 83, ¶ 34; ECF No. 87, ¶ 16. She says she returned to his cell to "reason with him and deescalate the situation." ECF No. 83, ¶ 35; ECF No. 87, ¶ 16. Nearby inmates began to taunt her and the plaintiff, saying "don't baby him" and calling the plaintiff a "pussy." ECF No. 83, ¶ 36; ECF No. 87, ¶ 17. Jackson believed that the plaintiff would ignore the other inmates and calm down after having some time alone. ECF No. 83, ¶ 37; ECF No. 87, ¶ 18. She ensured the cell doors were secured and left around 11:00 or 11:30 a.m. to take her break. ECF No. 83, ¶ 38; ECF No. 87-1 at 5.

The plaintiff contests Jackson's recollection and testified he was "trying to talk to her to try to convince her that I am not a fucked inmate." ECF No. 89-1 at 36:8–9; ECF No. 94,

---

[2] The plaintiff now says he did not receive a copy of the handbook. ECF No. 94, ¶ 28; ECF No. 96, ¶ 5.

¶ 32. He says Jackson taunted him, telling him to hit her. ECF No. 89-1 at 36:18–23; ECF No. 94, ¶¶ 34–37. He testified that, as Jackson left, an inmate said, "I smell pussy," which he believed could have been directed at him or Jackson. ECF No. 89-1 at 36:24–37:9. The plaintiff testified that Jackson responded, "Oh, yeah, cell 34 is a pussy." *Id.* at 37:1–2. The plaintiff believed Jackson was calling him a coward, and he felt disrespected and angry. *Id.* at 37:21–38:18. He responded by yelling to Jackson, "come back over here, open up this door so I can bust in your shit," *id.* at 38:20–22, which he testified meant he "was going to hit her in her mouth." ECF No. 89-2 at 8:19.

After Jackson left, the plaintiff argued with other inmates about his interaction with Jackson. ECF No. 83, ¶ 39; ECF No. 89-1 at 38:24–25, 48:15–50:15. He testified that the other inmates were being disrespectful, threatening him, and making fun of him because, he believed, Jackson had called him a pussy. ECF No. 89-1 at 50:15. The plaintiff explained his thoughts as he waited for Jackson to come back:

> I wanted to check on her, I wanted to snap on her, I wanted to yell at her after I was having a heated argument with an inmate. This -- this female was just getting out of hand, being a straight bitch, fucking taunting inmates. She wanted to keep taunting me. She just had a real bad attitude, and I wanted to correct her about that attitude.

*Id.* at 48:6–12. But he also testified that "as time was going by, I cooled off. I thought better of it, you know." *Id.* at 50:23–24. He testified that Jackson returned late from her lunch break because, he believed, she was conducting a background check on him. *Id.* at 50:24–51:8. He admitted having "no proof" of that suspicion. *Id.* at 51:3–5.

### 2. Physical Altercation

Jackson returned to pod 6A around 12:20 or 12:25 p.m. and released the inmates from their cells to eat. ECF No. 83, ¶ 41; ECF No. 87-1 at 5. Around the same time, Ithier arrived to pod 6A for clinic duty. ECF No. 83, ¶ 42. Jackson asked Ithier to retrieve a soft food tray for her, which he brought to her around 12:40 p.m. *Id.*, ¶¶ 43, 47. Jackson requested a soft tray for the plaintiff "out of an abundance of caution" after their earlier interaction. *Id.*, ¶ 44; ECF No. 87, ¶ 23. She did not believe he would act out but says he gave her "an angry stare" when she returned to the pod. ECF No. 83, ¶ 44; ECF No. 87,

¶ 23. The plaintiff denies giving her an angry stare. ECF No. 94, ¶ 44. But he testified that he believed Jackson ordered him the soft tray to "harass," "agitate," or disrespect him, which further upset him. ECF No. 83, ¶ 46; ECF No. 89-2 at 10:22–11:11. Jackson went to the plaintiff's cell without an inmate pod worker and unlocked and opened his cell door to provide him his lunch tray. ECF No. 83, ¶¶ 49, 51. She admits that, in hindsight, she should have told Ithier why she requested the soft tray or should have asked Ithier or a pod worker to come with her to deliver it to the plaintiff. ECF No. 87, ¶ 26. She did neither because she believed the plaintiff was being a "tough guy" but did not intend to cause her harm. ECF No. 83, ¶ 52; ECF No. 87, ¶ 26.

The parties dispute the following events. The defendants state that, as Jackson opened the plaintiff's cell door, he blocked the bottom of the door with his foot, so it could not fully close. ECF No. 83, ¶ 53. He did not say anything but instead pushed open the door with his shoulder, grabbed Jackson by her neck, smirked at her, and started punching her in the face with his other hand. *Id.*, ¶¶ 53, 55–56; ECF No. 87, ¶¶ 27–28. Jackson dropped the food tray but held onto her Jail keys, which were wrapped inside of her hand from opening the cell door. ECF No, 83, ¶ 58; ECF No. 87, ¶ 29. Jackson swears she did not use her Jail keys as a weapon but merely held them in her fist. ECF No. 87, ¶ 39. After the first punch, Jackson tried to defend herself by delivering strong hand strikes to the plaintiff's face and chin, as she was trained. ECF No. 83, ¶¶ 59, 63; ECF No. 87, ¶¶ 30, 33. The plaintiff maintained his grip around Jackson's neck and continued punching her. ECF No, 83, ¶ 61; ECF No. 87, ¶ 31. The plaintiff is much taller and stronger than Jackson, so he easily overpowered her. ECF No, 83, ¶¶ 64–65; ECF No. 87, ¶¶ 34–35. Jackson believed the plaintiff attempted to lift her up, perhaps to throw her over the railing of the top tier of the housing unit in an attempt to kill her. ECF No, 83, ¶ 62; ECF No. 87, ¶ 32. The plaintiff pulled Jackson into his cell by her neck and shoulder, pushed her onto the bed, pinned her down with his body, and continued to punch her. ECF No, 83, ¶¶ 72, 75; ECF No. 87, ¶¶ 36, 38. He repeatedly yelled, "You stupid bitch" while he hit Jackson. ECF No, 83, ¶ 74; ECF No. 87, ¶ 37.

The plaintiff testified that he was standing at the cell door when Jackson approached, but she did not say anything. ECF No. 89-1 at 57:5–9. He says he did not block the door with his foot because he was wearing socks, so the door could have injured him. ECF No. 94, ¶ 53; ECF No. 96, ¶ 14. He testified that as Jackson opened the door to deliver his food tray, he pushed it open with his shoulder an additional six inches, pointed his fingers "an inch or two" from her face, swore at her, and yelled at her to stop disrespecting him. ECF No. 89-1 at 56:12–58:22, 64:16–19, 66:4–10. Jackson jumped backed up in surprise but said nothing, swung at and hit the plaintiff, and they began to fight. *Id.* at 58:10–12, 58:25–59:1, 65:15–16. He admits she "probably thought I put my hands on her or I was going to. She probably felt justified to do so" given the proximity of the plaintiff's hand to Jackson's face. *Id.* at 65:16–18, 66:13–18. He later testified that Jackson "probably felt that I punched her" when he put his fingers in her face. ECF No. 89-2 at 16:23–24. The plaintiff testified that because Jackson hit him, he attempted to "snatch [her] up and beat the shit out of [her]." *Id.* at 20:12–15. He said Jackson "was dodging and weaving and steady attacking me," so he attempted "to take full advantage of it." *Id.* at 20:9–12. The plaintiff slipped on his socks, so he grabbed Jackson's neck and continued punching her. ECF No. 89-1 at 58:12–17. He testified that he "shot with my thumb out, and I pulled her into the room, put her against the wall." *Id.* at 60:22–25. The plaintiff continued punching Jackson as he pulled her into his cell and threw her onto his bed. *Id.* at 62:14–63:2. The plaintiff testified that he

> realized this is -- this is wrong, you know what I mean because you got this other officer down here, you know what I mean. He is going to go ahead and try and pop me, so I threw her on the bed. And then after that I was holding her down trying to take her taser, you know what I mean.

*Id.* at 61:13–18. The plaintiff used his left forearm to hold Jackson down while trying to take her taser so he could "keep it just in case they try and shoot me with it." *Id.* at 61:20–21, 62:23–63:2. He was unable to take her taser because it has a release button that he did not know about at the time. *Id.* at 63:9–16. Although he first testified that he did not plan to use the taser on Jackson, *id.* at 63:17–18, he later testified he "probably would have used it on her. I would have probably used it on her to stabilize her." ECF No. 89-2 at 21:6–7. The

plaintiff admitted Jackson "probably felt threatened" because he had been "in her face, you know, hands towards her, and I told her, 'Come back up here, and I bust in your shit.'" ECF No. 89-1 at 64:1–6. The plaintiff contests the defendants' statement that he was yelling "You stupid bitch" at Jackson during their fight. ECF No. 94, ¶ 74.[3]

The plaintiff testified that as he struggled to take Jackson's taser, someone approached him from behind and punched him in the back. ECF No. 83, ¶ 81; ECF No. 89-1 at 68:1–8. Three inmates then entered his cell to come to Jackson's aid. ECF No. 83, ¶ 82. The plaintiff testified that he heard the inmates say "[s]omething about let's get him, something to that effect." ECF No. 89-1 at 69:11–12. Jackson escaped the cell, took a few moments to gain her composure, and called master control for backup. ECF No. 83, ¶ 83; ECF No. 87, ¶ 43. Jackson says she saw the plaintiff on the ground, swinging his arms to fight the other inmates. ECF No. 83, ¶ 84; ECF No. 87, ¶ 45. The plaintiff disputes that he continued to be combative, pointing to affidavits from other inmates in support. ECF No. 94, ¶ 84 (citing ECF No. 96-1 at 4–5). The plaintiff testified that he covered himself for protection as inmates punched him and pulled him off Jackson. *Id.*, ¶ 83; ECF No. 89-1 at 68:8–22. The plaintiff then got up and tried to push his way out of his cell "to get in front of that camera so everything got on camera." ECF No. 89-1 at 69:13–70:3. He testified that the inmates continued to punch him, and he believed Jackson also continued to hit him as he tried to push his way out of the cell. *Id.* at 71:21–23. He explained that "everything happened really fast. Probably took me like two seconds." *Id.* at 72:10–11.

Ithier did not witness the initiation of the fight. He swears that, while he was on the phone, he noticed inmates running up the steps to the top tier. ECF No. 99, ¶ 9. He "looked up and observed Alvarado's hand around CO Jackson's neck and I observed Alvarado punching CO Jackson in the face with a closed fist." *Id.* Ithier hung up the phone, notified

---

[3] The plaintiff's proposed facts contradict his deposition testimony. He now says that when Jackson approached his cell, she did not remain silent but instead "challenge[d] me to hit her." ECF No. 96, ¶ 14. He insists he has an affidavit from another inmate that Jackson came to his cell to assault him. ECF No. 94, ¶ 57 (citing Ortiz Decl., Ex. 19). But that affidavit or exhibit is not in the plaintiff's response materials.

7

master control, and ran up the stairs to the plaintiff's cell. *Id.* When Ithier arrived at the cell, he saw the plaintiff "sitting on the ground outside of his cell and he was swinging his arms around, in what appeared to be an attempt to fight the other inmates who were near him." *Id.*, ¶ 10. He ordered the inmates to back up and ordered the plaintiff to stop resisting and to lay flat with his hands out. *Id.*, ¶ 11. Ithier told the plaintiff to obey his orders or he would use his taser on the plaintiff. *Id.* Ithier swears that officers are trained not to intervene in an altercation but instead to call for backup. *Id.*, ¶ 12. Because the plaintiff continued to be combative and non-compliant, and because the inmates outnumbered the two officers, Ithier determined he needed to use force to regain control of the plaintiff. *Id.*, ¶¶ 12, 21. He aimed his taser at the plaintiff, yelled "taser, taser," and deployed the taser towards the plaintiff for one five-second cycle. *Id.*, ¶ 13; ECF No. 83, ¶ 86. One of the taser prongs struck the plaintiff in his left temple, and the other struck him in the forearm. ECF No. 83, ¶ 88; ECF No. 99, ¶ 14.

The plaintiff disputes that he remained combative and disobeyed orders. ECF No. 94, ¶ 86; ECF No. 96, ¶ 19. He testified that he stopped fighting once the inmates entered his cell and attacked him. ECF No. 89-1 at 74:10–76:4, 79:19–21. He says he pushed his way out of the cell, "stayed up for probably like about five seconds, three seconds," and then went to the ground. *Id.* at 74:23–75:24. The plaintiff testified that the officers never ordered "the other inmates to stop fighting me, to stop assaulting me, to leave me alone, to back away." ECF No. 94, ¶ 85; ECF No. 89-2 at 35:5–7. He testified that he "did not hear Ithier at all telling inmates to stop attacking me." ECF No. 89-1 at 154:13–14. But he conceded that he did not believe Ithier "stood up there and watched the inmates attack [him] and decided to tase [him]." *Id.* at 155:18–22. He testified that he did not feel the taser but simply saw bright lights and heard a loud sound, leading him to believe he had been kicked in the head. *Id.* at 79:3–16. He insists Ithier intentionally shot him in the head with the taser to kill him. ECF No. 94, ¶ 88; ECF No. 96, ¶ 19.

The taser incapacitated the plaintiff, but Ithier noticed there were inmates still near the plaintiff despite his earlier order to disperse. ECF No. 83, ¶ 89; ECF No. 99, ¶ 15. He

remained by the plaintiff and ordered the inmates to return to their cells and lock in. ECF No. 83, ¶¶ 89–90; ECF No. 99, ¶ 15. Jackson saw inmate Alex Adams walk past the plaintiff and kick him, and she ordered Adams to stop. ECF No. 83, ¶ 91; ECF No. 87, ¶ 50. Jackson and Ithier swear they did not allow any inmates to assault the plaintiff after he had been tased. ECF No. 87, ¶ 51; ECF No. 99, ¶ 16. The plaintiff testified that he does not remember any inmate attacking him after he was tased, and "everything stopped." ECF No. 89-1 at 80:1–4. He says he did not hear Jackson tell Adams not to kick him and maintains the officers allowed inmates to attack him but only before he had been tased. ECF No. 94, ¶ 92; ECF No. 96, ¶ 21.

The plaintiff provided affidavits from two other inmates. The first, from Michael Skinner, says he witnessed "Officer Jackson and alot [sic] of other inmates kicking and punching on Alvardo [sic]." ECF No. 96-1 at 4. Skinner swears the plaintiff "was covering his face with his hands not fighting back on the top tier." *Id.* He says the plaintiff "collapsed on the floor and inmates were kicking him. No one tried to stop them it was 2 Officers there at the time." *Id.* He says neither officer assisted the plaintiff, and "the male officer" used a taser on the plaintiff "in the head or Neck Area." *Id.*

The other affidavit is from inmate Dallas Barnes, who refers only to a person he calls "Mr Wolf." *Id.* at 5. Barnes swears that he "witnessed Mr Wolf get jumped on by officer and inmates. He was also tased in the process." *Id.* He swears he does not recall the exact date but says it may have been "over a year and a half ago." *Id.* He says "the use of the taser was so unessasary [sic]." *Id.* Barnes signed the affidavit on February 16, 2020, more than two years after the fight between Jackson and the plaintiff. *Id.*[4]

### 3. Aftermath

Once the plaintiff was incapacitated and the other inmates had dispersed, Jackson handcuffed the plaintiff's hands behind him, and Ithier monitored the plaintiff and the

---

[4] The plaintiff also relies on information from other inmates (Antonio Ortiz, Alex Adams) who did not provide statements or affidavits. That information is not evidence; it is inadmissible hearsay that I will not consider for purposes of this decision. *See* Fed. R. Evid. 801 & 802; *McCottrell v. White*, 933 F.3d 651, 656 (7th Cir. 2019).

situation. ECF No. 83, ¶ 93. The plaintiff refused to place his hands behind his back, so Jackson attempted to handcuff his wrist and move his arm behind him. *Id.*, ¶ 94; ECF No. 87, ¶ 52. She eventually "settled on" handcuffing him behind his neck. ECF No. 83, ¶ 95; ECF No. 87, ¶ 52. Ithier says Jackson used appropriate strikes in self-defense and did not strike the plaintiff after he was tased. ECF No. 83, ¶ 98; ECF No. 99, ¶ 23. He swears he and Jackson used "only the amount of force that was appropriate and necessary." ECF No. 83, ¶ 97; ECF No. 99, ¶¶ 22–23. The plaintiff disputes that Jackson handcuffed him. ECF No. 94, ¶ 93. He asserts that Jackson pulled his hair, which cut his scalp and caused his face to "drop[] to the ground." *Id.*, ¶ 96. He says Jackson's actions caused a cut on his nose. *Id.*; ECF No. 95, ¶ 6. Yet he testified that he did not know "who cuffed me up in front" and "didn't even know she cuffed me. To be honest with you, I don't remember her cuffing me at all." ECF No. 89-1 at 79:9–10; ECF No. 89-2 at 34:21–23. He also testified that he had no injuries on his head and did not know how he received the cut on his nose. ECF No. 89-1 at 85:5–9.

Additional staff quicky arrived in the pod and assisted Ithier in locking down the inmates. ECF No. 83, ¶¶ 100–01. Two officers took the plaintiff to be searched and medically assessed. *Id.*, ¶ 102. Officers medically cleared the plaintiff and photographed him and Jackson. *Id.*, ¶ 103; ECF No. 88-7 at 26–42. The officers took the plaintiff to pod 4D, again assessed and medically cleared him, and then escorted him to a cell. ECF No. 83, ¶ 104. The plaintiff testified that he believed he was taken to pod 4D to be protected from the other inmates and the officers. ECF No. 83, ¶ 153; ECF No. 89-1 at 83:10–17. Yet he also testified that he had no reason to believe pod 4D was where the Jail kept inmates in protective custody. ECF No. 89-1 at 95:17–22. Around February 11, 2018, he was placed on suicide watch after telling a captain he felt suicidal because he did not receive recreation time. ECF No. 83, ¶ 154; ECF No. 89-1 at 87:12–20.

Jackson provided a statement of the incident to her supervising officers and detectives and drafted an incident report. ECF No. 83, ¶ 107; ECF No. 87, ¶¶ 55, 57; ECF No. 88-7. Medical staff examined her. ECF No. 83, ¶ 108. The plaintiff testified that he was

given ibuprofen for pain but did not receive an x-ray, MRI, or other diagnostic tests. *Id.*, ¶ 106; ECF No. 89-1 at 78:8–17. Contrary to his deposition testimony, the plaintiff now asserts that officers x-rayed his "left skull area" and his ribs a few days later. ECF No. 94, ¶ 106; ECF No. 96, ¶ 37. The plaintiff was placed on maximum custody status, though the parties disagree when this occurred. ECF No. 83, ¶ 110; ECF No. 94, ¶ 110.

Two detectives investigated the matter to determine if criminal charges were appropriate. ECF No. 83, ¶ 126. The detectives interviewed Jackson, reported her injuries, and photographed her. *Id.*, ¶¶ 127–28; ECF No. 84, ¶ 6; ECF No. 84-1 at 2–8. Jackson reiterated the events as provided in her declaration. ECF No. 84, ¶¶ 7–20. The detectives also spoke with Ithier, who relayed the events as described in his declaration. ECF No. 83, ¶ 129; ECF No. 84, ¶¶ 21–30. The detectives spoke next with inmate Carl Price, who confirmed Jackson's recollection of the events. ECF No. 83, ¶ 130; ECF No. 84, ¶¶ 32–36. Price stated he was the first inmate who came to Jackson's aid inside the plaintiff's cell. ECF No. 84, ¶ 33; ECF No. 84-1 at 57. Price saw an inmate on top of Jackson, grabbed the inmate, and the inmate began to try and fight Price. ECF No. 84, ¶¶ 35–36; ECF No. 84-1 at 57. Price said that a short time later, another officer entered the cell and used his taser on the inmate who was fighting with Jackson. ECF No. 84, ¶ 36; ECF No. 84-1 at 57.

The detectives attempted to speak with the plaintiff, but he refused to leave his cell or be interviewed. ECF No. 83, ¶ 131; ECF No. 89-2 at 22:21–23. The plaintiff never spoke with the detectives or informed them, as he asserts, that Jackson started the fight. ECF No. 83, ¶ 132; ECF No. 89-1 at 22:24–23:4. There was video of the incident, but it captured only the end of the events. ECF No. 83, ¶ 133.[5] The detectives determined that there was sufficient evidence to present the investigation to the Milwaukee County District Attorney's Office for review of charges of battery by a prisoner. *Id.*, ¶ 135. An assistant district attorney

---

[5] The parties mention the video of the incident, and the defendants submitted a "placeholder" exhibit for the video. ECF No. 88-8. But neither party provided the video to the court. Because the parties did not make the video available, and the facts and supporting evidence sufficiently describe the events the video purports to show, I will not consider the video for purposes of this decision.

issued that charge and filed a criminal complaint against the plaintiff. *Id.*, ¶ 136; ECF No. 84-1 at 90.[6]

The Jail conducted its own review of the incident to determine if the use of force was appropriate and reasonable and if Jail policies and procedures were followed. ECF No. 83, ¶¶ 138–40. Captain Jason Hodel reviewed the investigation file and concluded that Jackson and Ithier used appropriate force to prevent further escalation of the situation and avoid further potential violence, injury, or death. *Id.*, ¶¶ 141, 143; ECF No. 88, ¶¶ 33–34, 41. He concluded that Ithier's use of the taser allowed him to use minimal force to take the plaintiff into custody while also protecting Jackson and the other inmates. ECF No. 83, ¶ 142; ECF No. 88, ¶ 35. The plaintiff disputes Hodel's conclusion because, he says, Hodel did not speak with him and obtain his side of the story. ECF No. 94, ¶¶ 141–43; ECF No. 96, ¶ 41.[7]

## D.    Disciplinary Hearing

After the February 2018 incident, Ithier drafted a disciplinary incident report and rules violation report. ECF No. 83, ¶ 147; ECF No. 85-3. In his report, Ithier wrote that the plaintiff "decided to assault" Jackson while she was handing him his food tray. ECF No. 85-3. He says the plaintiff grabbed Jackson by the throat, pulled her into his cell, and punched her. *Id.* He does not say that he witnessed the initiation of the fight but that once he "realized what was happening, [he] immediately notified master control about the situation" and "ma[d]e [his] way to inmate Alvarado's cell and ordered him to stop or he will be tased." *Id.* Ithier wrote that the plaintiff "ignored my orders so I drew my taser and gave inmate Alvarado one five second cycle." *Id.* Ithier charged the plaintiff with five rule violations: disobeying orders, committing a disruptive act, committing an act requiring the use of force, assault, and assault on staff. *Id.*; ECF No. 83, ¶ 150; ECF No. 99, ¶ 31.

---

[6] According to the electronic docket, the case was dismissed in February 2020. *See* https://wcca.wicourts.gov/ (Dodge County Case Number 2018CF000035).
[7] The plaintiff spends several paragraphs describing his medical treatment at Waupun in the days following the incident. ECF No. 95 ¶¶ 11–19. His medical treatment is not at issue in this lawsuit, so I will not detail these proposed facts.

A copy of the rule violations report was provided to the plaintiff in pod 4D pending a disciplinary hearing on the violations. ECF No. 83, ¶¶ 151–52; ECF No. 85-3; ECF No. 99, ¶ 32. According to Lieutenant Stevens, the drafting officer (not the hearing lieutenant) delivers the report to the disciplinary housing unit, and officers there provide it to the inmate. ECF No. 83, ¶ 155; ECF No. 85, ¶ 6. But an inmate on suicide watch does not receive paper for safety purposes, and the report is placed in the inmate's folder for review during his one hour of recreation time. ECF No. 83, ¶ 156; ECF No. 85, ¶ 6.

Jail policy requires that a disciplinary hearing be conducted by a lieutenant not involved in the corresponding incident. ECF No. 83, ¶ 159. Because Stevens did not work first shift on February 9, 2018, he did not observe or respond to the incident and was an impartial decisionmaker for the hearing. *Id.*, ¶ 160; ECF No. 85, ¶ 11. Jail policy does not require the hearing lieutenant to follow up with the officer who wrote the report to ensure the inmate receives a copy at least 24 hours before the hearing. ECF No. 83, ¶ 158. It is therefore undisputed that it was not Stevens's responsibility to provide the plaintiff 24-hours' notice of the disciplinary hearing before conducting it. *Id.*, ¶ 163; ECF No. 85, ¶ 14. The plaintiff testified that he never received notice that he would be subject to a disciplinary hearing. ECF No. 89-1 at 96:7–15. But he conceded it was not Steven's responsibility to provide him notice of the hearing. *Id.* at 111:14–24.

Although Stevens did not remember his specific procedures before this hearing, he swears that before any disciplinary hearing he would read the rules violation report, the incident report and any supplemental reports, speak with the involved officers, and review video of the incident if available and if time allowed. ECF No. 83, ¶ 164; ECF No. 85, ¶ 15. He determined that the video of this incident was unhelpful, but he did review an email sent to all Jail lieutenants summarizing the incident and the reports. ECF No. 83, ¶¶ 165–66; ECF No. 85, ¶ 16. During the hearing, Stevens customarily asked the inmate if he received a copy of the rules violation report and, if not, provided him a copy to review before continuing the hearing. ECF No. 83, ¶ 167; ECF No. 85, ¶ 17. Stevens would read the violated rules and the violation report, ask the inmate for his side of the story, and ask the inmate if he had

any witnesses with relevant testimony. ECF No. 83, ¶¶ 168–69; ECF No. 85, ¶¶ 18–19. He made an effort to speak with the identified witnesses. ECF No. 83, ¶ 169; ECF No. 85, ¶ 19. It is the inmate's responsibility to identify any relevant witnesses and explain what relevant information they can offer. ECF No. 83, ¶ 171; ECF No. 85, ¶ 21. Stevens would interview witnesses only if the inmate explained what relevant information he or she had to add to the hearing. ECF No. 83, ¶ 172; ECF No. 85, ¶ 21. The plaintiff disputes it was his responsibility to provide witnesses, but he cites no Jail policy or rule providing otherwise. ECF No. 94, ¶ 171; ECF No. 96, ¶ 46.

On February 12, 2018, Stevens conducted the plaintiff's disciplinary hearing on the rules violation report from February 9, 2018. ECF No. 83, ¶ 162. For his safety, and given the plaintiff's history, Stevens held the hearing outside of the plaintiff's cell, which Jail policy allows. *Id.*, ¶¶ 161, 175; ECF No. 85, ¶¶ 10, 22. Stevens introduced himself, read the rules violation report to the plaintiff, and asked him to provide his description of the incident. ECF No. 83, ¶¶ 176–77; ECF No. 85, ¶ 24. It is undisputed that the plaintiff told Stevens he could not remember the incident, had blacked out the entire event, and could only remember what happened before and after. ECF No. 83, ¶ 178; ECF No. 85, ¶ 24. Stevens does not recall whether the plaintiff asked him to interview any witnesses. ECF No. 83, ¶ 179; ECF No. 85, ¶ 25. But he swears that if the plaintiff had named any, Stevens would have noted their names on the findings sheet and interviewed them, if they had anything relevant to add. ECF No. 83, ¶ 179; ECF No. 85, ¶ 25. There are no witnesses listed on the findings sheet, so Stevens believes the plaintiff did not name any during the hearing. ECF No. 83, ¶ 180; ECF No. 85, ¶ 25; ECF No. 85-1. Stevens also does not recall if the plaintiff asked him to review the video footage. ECF No. 83, ¶ 181; ECF No. 85, ¶ 26. But he reviewed the footage before the hearing and concluded that it did not show the assault and offered no exculpatory evidence. ECF No. 83, ¶¶ 181–82; ECF No. 85, ¶ 26.

The plaintiff testified that during the hearing, he "said I wanted video footage, and I want witnesses," and Stevens said he could not have either. ECF No. 89-1 at 97:23–25. He asserts Stevens prevented him from viewing the video because he knew it would allow the

plaintiff to identify inmates who could be witnesses. ECF No. 94, ¶¶ 181–82; ECF No. 96, ¶ 50. But he did not tell Stevens that Jackson was the aggressor of the incident or offer any evidence suggesting that she was. ECF No. 89-1 at 113:3–5, 113:14–16, 114:18–115:2. He also testified that he did not tell Stevens who he wanted as a witness. *Id.* at 98:18–99:1. He stated that after Stevens "told me I couldn't have any witnesses, I didn't see the purpose of him giving me names." *Id.* at 98:21–23. He testified that, if allowed, he would have given the names Alex Adams, Tristan Small, and James McCoy. *Id.* at 99:18–20. But he did not know what those witnesses would have said, if they would have supported his version of the events, or whether they even observed the fight. *Id.* at 99:2–101:7; 105:9–12. He knew only their names and that they were in pod 6A with him in February 2018. *Id.* at 99:12–24. He further testified that he later spoke with these inmates, and none would have supported his version of the events that Jackson struck him first. *Id.* at 165:12–166:18. Yet he "strongly assume[d]" their testimony would have helped him beat one of his disciplinary charges. *Id.* at 173:21–22. The plaintiff further testified that he did not know what the video would have shown. *Id.* at 101:21–24, 105:13–16. He said he did not know if it "would have captured the assault, but that's what I was counting on." *Id.* at 101:23–24.

Based on the evidence, Stevens sustained the five rule violations against the plaintiff and imposed 33 days' solitary confinement with three days credit for time served. ECF No. 83, ¶ 190; ECF No. 85, ¶ 27. That punishment corresponds with the maximum permitted for each category of rule violation: 10 days each for the two category 5 violations (assault and assaulting staff), 7 days for the category 4 violation (committing an act requiring use of force), and 3 days each for the two category 2 violations (disobeying orders and committing a disruptive act). ECF No. 83, ¶¶ 191–92; ECF No. 85, ¶ 28. Stevens swears he imposed what he believed to be an appropriate punishment based on the severity of the situation. ECF No. 85, ¶ 28. Stevens customarily would inform an inmate of the violations, punishment, and right to appeal at the conclusion of the disciplinary hearing. *Id.*, ¶ 32; ECF No. 83, ¶ 195. He then would deliver the rules violation report and his findings to the Classification Department to make copies for the inmate. ECF No. 83, ¶ 196; ECF No. 85,

¶ 33. If the inmate were on suicide watch, as the plaintiff was, an officer would place the documents into the inmate's file for him to review during his hour of recreation time. ECF No. 83, ¶ 197; ECF No. 85, ¶ 33. The plaintiff testified both that he did not remember if the reports were placed in his property and that the report *was* placed in his property because he was on suicide watch. ECF No. 89-1 at 110:1–4, 109:15–18. He also testified he saw a copy of the violation report on the day of his hearing and the day he left the Jail. ECF No. 83, ¶¶ 198–99; ECF No. 89-1 at 110:7–11.

The plaintiff conceded during his deposition that there was enough evidence to sustain "[a]t least four" of the five rule violations. ECF No. 83, ¶ 208; ECF No. 89-1 at 139:5–14. He does not dispute the punishment was given based on the evidence. Yet he insists that Stevens imposed the 33 days' confinement to prevent him from calling his family or lawyer to prepare a motion for postconviction relief in his pending criminal action. ECF No. 94, ¶ 192; ECF No. 96, ¶ 54; ECF No. 89-1 at 105:19–106:5. He testified that Stevens did so "[o]ut of retaliation. Out of hate," even though he had never had any problem with Stevens. ECF No. 89-1 at 106:23–107:2. In support he says the deadline for his motion was March 12, 2018, which also was the final of his 33 days' confinement. ECF No. 94, ¶ 192; ECF No. 96, ¶ 54. The plaintiff conceded he had no evidence that Stevens knew about the plaintiff's filing deadline. ECF No. 89-1 at 108:15–17. Stevens swears he was unaware of the plaintiff's pending motion or deadline when he held the hearing and imposed the disciplinary sanctions. ECF No. 85, ¶ 29.

Stevens did not receive notice that the plaintiff wanted to appeal the disciplinary decision, but he would not have been responsible for responding to that appeal. ECF No. 83, ¶ 210. The plaintiff did not appeal his disciplinary punishment and was transferred back to Waupun four days after Stevens issued his findings. ECF No. 83, ¶¶ 210–11, 215; ECF No. 85, ¶ 30. The plaintiff spent two additional days on suicide watch and served only two of the 33 days' disciplinary confinement imposed. ECF No. 83, ¶¶ 210, 216; ECF No. 88, ¶¶ 20–21. The plaintiff testified that he asked to be returned to Waupun as part of his attempt "to manipulate Milwaukee County Jail" and avoid being placed on disciplinary segregation

any time he returned to the Jail. ECF No. 89-1 at 117:15, 142:17–144:8. The plaintiff has been placed on maximum custody status during each subsequent return to the Jail. *Id.* at 144:12–18. But he conceded that was not Stevens's decision. *Id.* at 148:11–14.

## E.    Later Events

The plaintiff eventually filed grievances against Jackson and Ithier in September 2018. ECF No. 83, ¶ 221; ECF No. 88-11. On January 23, 2019, he mailed to the Milwaukee County Sheriff's Office notices of his claims dated January 9, 2019, though he sent the notices on an incorrect form. ECF No. 83, ¶ 218; ECF No. 88, ¶ 42. The Sheriff's Office received his claims on January 29, 2019. ECF No. 83, ¶ 219; ECF No. 88-10. He also mailed to the Milwaukee County Clerk's Office notices of his claim regarding the February 2018 incident, which the office received on February 6, 2019. ECF No. 83, ¶ 220; ECF No. 86, ¶ 8; ECF No. 86-1.

## II. ANALYSIS

A party is entitled to summary judgment if it shows that there is no genuine dispute as to any material fact and it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those that "might affect the outcome of the suit." *Anderson*, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* "[D]isputed facts that are not outcome-determinative are not material and will not preclude summary judgment." *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010).

Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). To survive a motion for summary judgment, a non-moving party must show that sufficient evidence exists to allow a jury to return a verdict in its favor. *Brummett v. Sinclair Broad. Grp., Inc.*, 414 F.3d 686, 692 (7th Cir. 2005).

17

I must draw all reasonable inferences in favor of the plaintiff as the non-moving party. *See Kirsch v. Smith*, 894 F.Supp. 1222, 1228 (E.D. Wis. 1995), *aff'd*, 92 F.3d 1187 (7th Cir. 1996) (citing *Anderson*, 477 U.S. at 249). Unsupported speculations and assertions do not create a genuine dispute of fact and cannot defeat summary judgment. *See Ammerman v. Singleton*, 817 F.App'x 265, 268 (7th Cir. 2020) (citing *Herzog v. Graphic Packaging Intl, Inc.*, 742 F.3d 802, 806 (7th Cir. 2014)). The plaintiff instead, as the nonmoving party, needs to come forward with evidence showing his entitlement to relief. *Cooper v. Haw*, 803 F.App'x 942, 946 (7th Cir. 2020) (citing *Beatty v. Olin Corp.*, 693 F.3d 750, 754 (7th Cir. 2012)).

**A.    The Plaintiff's Affidavit**

In several places, the plaintiff's responses to the defendants' proposed facts or his proposed supplemental facts directly contradict the testimony from his December 2, 2019, and January 7, 2021 depositions. The plaintiff's proffered reason for the discrepancies is that he "made a mistake," is clearing up his "ambiguous" testimony, or suffered a "memory lapse" during his two depositions (taken over a year apart) that caused him not to remember details he now vividly recalls. *See, e.g.*, ECF No. 94, ¶¶ 28, 55; ECF No. 95, ¶ 8; ECF No. 96, ¶¶ 5, 14, 29, 36–37, 53, 58. In support of these contrary facts, the plaintiff cites only his affidavit, which merely reiterates verbatim what the proposed fact states. He does not cite documentary evidence or anything else in support of his contradictory facts. The plaintiff signed his affidavit, but he did not swear that the statements in it are true under penalty of perjury. ECF No. 96 at 21.

Under what is known as the "sham-affidavit rule," a party cannot use an affidavit to contradict earlier deposition or sworn testimony for the purpose of manufacturing a dispute of fact to defeat summary judgment. *See James v. Hale*, 959 F.3d 307, 315–16 (7th Cir. 2020) (citing cases); *Adusumilli v. City of Chicago*, 164 F.3d 353, 360 (7th Cir. 1998) (quoting *Diliberti v. United States*, 817 F.2d 1259, 1263 (7th Cir. 1987)) ("A party cannot prevail on a motion for summary judgment by 'submitting an affidavit containing conclusory allegations which contradict plain admissions in prior deposition or otherwise sworn testimony.'"). When the depositions and affidavit conflict, I must disregard the statements in the affidavit "'unless

it is demonstrable that the statement in the deposition was mistaken.'" *Adusumilli*, 164 F.3d at 360 (quoting *Russell v. Acme–Evans Co.*, 51 F.3d 64, 67–68 (7th Cir. 1995)). I also may consider the contradictory statements if there is newly discovered evidence supporting the contradictory information or if the affidavit clarifies "ambiguous or confusing deposition testimony." *James*, 959 F.3d at 317.

The plaintiff's affidavit impermissibly contradicts his sworn deposition testimony, and none of the exceptions to the sham-affidavit rule apply. The plaintiff's deposition testimony was not ambiguous. Nor does he provide anything to demonstrate how a "memory lapse" caused his twice-given testimony to falter or to explain why he now remembers details that conveniently aid his claims but could not remember them four months earlier. He states he has "newly discovered evidence" from Michael Skinner that proves his new facts. ECF No. 95, ¶ 60. But that affidavit does not support the plaintiff's contradictory statements. It offers additional evidence in support of statements he gave during his depositions. For purposes of this decision, I will not consider the plaintiff's proposed facts or statements in his affidavit that directly contradict his depositions, refer to matters of which he lacks personal knowledge, or are legal argument disguised as statements of fact. *See* Fed. R. Civ. P. 56(c)(4).

**B.    Excessive Force**

The plaintiff claims Officers Jackson and Ithier used excessive force on him. He claims Jackson attacked him for no reason and that Ithier used his taser when the plaintiff had already ceased fighting back and was not resisting. Because the plaintiff was a pretrial detainee at the time of the alleged assault, his claims must be analyzed under the Fourteenth Amendment's standard of objective reasonableness, which "turns on the 'facts and circumstances of each particular case.'" *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). I must judge the reasonableness of a particular use of force "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Id.*

Under an objective reasonableness inquiry, "the question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397 (citations omitted). The proper application of this standard requires consideration of the following factors:

> the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Kingsley*, 576 U.S. at 397. This list is not exhaustive but illustrates some of the "objective circumstances potentially relevant to a determination of excessive force." *Id*.

### 1.    Officer Jackson

The parties dispute several facts about the altercation between the plaintiff and Jackson, many of them immaterial (e.g. whether Jackson challenged the plaintiff to hit her before leaving for her lunch break, whether the plaintiff gave Jackson an angry stare when she returned from her break). The plaintiff asserts Jackson again "challenged" him to hit her when she opened his cell door, but he previously testified that she remained silent. I will not credit the plaintiff's contradictory statements that Jackson challenged him to hit her. *See James*, 959 F.3d at 316. Importantly, the parties dispute whether Jackson or the plaintiff threw the first punch and how the fight escalated from there.

Even accepting the plaintiff's version of the events (as he testified, not the contradictory facts contained in his summary judgment materials), the evidence would not allow a reasonable jury to conclude that Jackson used excessive force in violation of the plaintiff's Fourteenth Amendment rights. The plaintiff testified that he felt disrespected and was angry at Jackson after she locked him in before her lunch break. He testified that he yelled at her as she left his cell, telling her to come back so he could hit her in her mouth. He said he "wanted to snap on her" and "correct her about [her] attitude." Although he says he calmed down while Jackson was out, he admitted becoming angry again when Jackson

returned and ordered him a soft food tray because he believed she did so to further disrespect him. He reiterated on multiple instances in his testimony how important it is to him to feel respected and how he felt Jackson had disrespected him. He says that when Jackson opened his cell door to give him his lunch tray, he pushed the door open with his shoulder, put his finger within an inch or two of Jackson's face, and yelled profanities at her, demanding that she respect him. The plaintiff concedes that Jackson's actions were a justified response to her belief that the plaintiff was going to attack her, and she needed to defend herself. He says Jackson jumped back in surprise and then swung at him because she "probably thought I put my hands on her or I was going to. She probably felt justified to do so." He testified Jackson probably felt threatened because he had yelled at her earlier and threatened to hit her, and now he was "in her face, you know, hands towards her," and was yelling at her again. A reasonable officer in Jackson's position would have defended herself against the plaintiff, a much larger and stronger inmate who had yelled at her and threatened to hit her in the face.

Nor could a reasonable jury conclude that Jackson's actions after the initial strike were excessive. The plaintiff testified that as soon as Jackson hit him once, he attempted to "snatch [her] up and beat the shit out of [her]." He testified that he continued to punch Jackson as he pulled her into his cell. He pushed her against the wall and then onto the bed, using his bodyweight to hold her down. He says he forcefully attempted to take her taser from her but was unable to do so. He testified that if he had been able to take her taser, he would have used it on her "to stabilize her." The plaintiff continued punching and fighting back until other inmates entered his cell, struck him, and attempted to pull him off Jackson. Jackson may have incorrectly interpreted the plaintiff's initial actions as requiring her to defend herself. But a mistake in judgment in the heat of the moment does not constitute a constitutional violation. *See Davis v. Wessel*, 792 F.3d 793, 802 (7th Cir. 2015) (citing *County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998)). Once the plaintiff began to fight back, Jackson reasonably defended herself against an aggressive inmate who was punching her and attempting to take her taser from its holster.

The plaintiff has not produced evidence that would allow a reasonable jury to conclude that Jackson's actions in defending herself constituted excessive force, whichever version of the events is true. The parties' factual disputes therefore do not preclude summary judgment for defendant Jackson on the plaintiff's excessive force claim. I will grant summary judgment for Jackson on this claim.

### 2.    Officer Ithier

Ithier did not witness the beginning of the altercation between the plaintiff and Jackson. He swears that inmates began rushing to the top tier, and he saw the plaintiff grabbing Jackson by the neck and punching her. He ran to the plaintiff's cell, where he says the plaintiff remained combative, fighting inmates and disobeying orders to lay on the ground flat with his hands out. He swears that he believed the plaintiff posed a danger to Jackson and the other inmates, and he needed to regain control of the plaintiff to prevent him from harming others. He swears he did not deploy his taser until the plaintiff failed to comply with his order to stop fighting.

The plaintiff disputes Ithier's account. Unlike his statements about Jackson, the plaintiff's testimony about Ithier's involvement is consistent with his affidavit. He testified that once the other inmates entered his cell to pull him off Jackson, he covered up for protection and attempted to push his way out of the cell. He testified that he did not fight back and went to the ground to protect himself. He maintains that position now. He also provided an affidavit from inmate Michael Skinner, who swears he saw the plaintiff covering his face and not fighting back. He says the plaintiff collapsed onto the floor as other inmates kicked him. Skinner says "the male officer" (presumably Ithier) used his taser on the plaintiff, even though he was no longer fighting back. ECF No. 96-1 at 4.[8]

Construing the evidence in favor of the plaintiff as the non-moving party, I find that a reasonable jury could conclude that when Ithier used the taser on the plaintiff, the plaintiff was on the ground, was no longer fighting Jackson, and was attempting to protect himself

---

[8] The plaintiff also provided a statement from inmate Dallas Barnes. ECF No. 96-1 at 5. But Barnes does not name the plaintiff or either officer, and he refers only to "Mr Wolf." This affidavit says nothing about the events of this lawsuit and is unhelpful and irrelevant.

from the other inmates. If so, a reasonable jury could conclude that Ithier's act of using the taser was unreasonable under the circumstances and was therefore excessive. I will deny summary judgment for Ithier on this claim. A jury must decide whose version of the events is correct and whether Ithier's actions were excessive or warranted given the situation confronting him.

**C.    Failure to Intervene/Protect**

The plaintiff also claims that Jackson failed to protect him from Ithier's use of the taser and Ithier failed to protect him from Jackson or the other inmates attacking him. A claim that Jail officials failed to protect an inmate amount to a claim of deliberate indifference. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Farmer v. Brennan*, 511 U.S. 825, 832–33 (1994) (quotations omitted) (noting that prison officials "must take reasonable measures to guarantee the safety of the inmates" and "to protect prisoners from violence at the hands of other prisoners"). As noted, the plaintiff was a pretrial detainee at the time of these events. As with his claim of excessive force, I review his claim of deliberate indifference under the Fourteenth Amendment. *See Hardeman v. Curran*, 933 F.3d 816, 821–22 (7th Cir. 2019) (citing *Kingsley*, 576 U.S. at 397).

To sustain a claim of deliberate indifference under the Fourteenth Amendment, the plaintiff must show that the officers acted "with purposeful, knowing, or reckless disregard of the consequences" of their actions. *Miranda v. County of Lake*, 900 F.3d 335, 354 (7th Cir. 2018). It is not enough to show they acted with negligence or even gross negligence. *See Williams v. Ortiz*, 937 F.3d 936, 942 (7th Cir. 2019) (citing *McCann v. Ogle County*, 909 F.3d 881, 886 (7th Cir. 2018)). The plaintiff also must show that the conditions of his confinement were objectively unreasonable; that is, he must show that the conditions were not "'rationally related to a legitimate non-punitive governmental purpose'" or that they were "'excessive in relation to that purpose.'" *Hardeman*, 933 F.3d at 822 (citing *Kingsley*, 576 U.S. at 397). I must "focus on the totality of facts and circumstances" that the defendants faced and "gauge objectively—without regard to any subjective belief held by the individual—whether the response was reasonable." *Williams*, 937 F.3d at 942.

### 1. Officer Jackson

The evidence would not allow a reasonable jury to conclude that Jackson failed to protect the plaintiff from Ithier or the other inmates. The plaintiff testified that he pulled Jackson into his cell, pushed her down onto his bed, and used his bodyweight to hold her down as he attempted to take her taser. It was at this time that other inmates entered the cell and attempted to pull the plaintiff off Jackson. The plaintiff responded by covering himself for protection and then pushing his way out of the cell where he collapsed to the ground before being tased by Ithier. He says all this happened in a matter of seconds.

The plaintiff's description of the events suggests no time when Jackson could have intervened to protect the plaintiff from other inmates. As explained above, she was reasonably defending *herself* from the plaintiff; the other inmates were coming to her aid to defend her from the plaintiff. Moreover, Jackson swears that after the plaintiff had been tased, she told an inmate-passerby to stop kicking him. The plaintiff testified that he did not remember any inmate attacking him after he was tased, and "everything stopped." ECF No. 89-1 at 80:1–4. It is undisputed that after the plaintiff was subdued and tased, Jackson did not allow other inmates to assault him.

No reasonable jury could conclude that Jackson purposefully or recklessly allowed inmates to attack the plaintiff while she was defending herself from his strikes or after he had been tased and was on the ground outside his cell. The evidence instead shows she ordered other inmates *not* to attack the plaintiff, even after he had been fighting with her. Jackson is entitled to summary judgment on this claim.

### 2. Officer Ithier

Because no reasonable jury would conclude that Jackson used excessive force on the plaintiff, she committed no constitutional violation from which Ithier could have failed to protect him. *See Lewis v. Downey*, 581 F.3d 467, 472 (7th Cir. 2009) (explaining that a bystander officer may be held liable only for a fellow officer's use of excessive force or constitutional violation against an inmate). I therefore analyze only whether a reasonable jury could conclude that Ithier failed to protect the plaintiff from the other inmates.

24

Ithier swears that when he arrived at the plaintiff's cell, he ordered the other inmates to back away from the plaintiff and go to their cells. He says the plaintiff was swinging at the other inmates but does not say whether other inmates were attacking the plaintiff. Ithier says he is trained not to physically intervene in fights, but he believed the plaintiff posed a danger to him and the entire pod. He therefore warned the plaintiff to stop fighting back, or he would use his taser to subdue the plaintiff. He swears that he did not allow any inmates to assault the plaintiff and again ordered them to return to their cells. The plaintiff testified that several inmates continued to attack him after he pushed his way out of his cell. He stated that he dropped to the ground to protect himself and avoid further injury. He says he saw Ithier, but Ithier did not order the other inmates to stop attacking him and return to their cells. Yet he concedes that Ithier did not simply stand by idly watching the inmates attack the plaintiff before tasing him. Inmate Michael Skinner states in his affidavit that neither officer involved in the altercation tried to stop inmates from attacking the plaintiff.

Even taking the plaintiff's version of the events as true, a reasonable jury could not conclude that Ithier unreasonably failed to protect the plaintiff from the other inmates. It is undisputed that when Ithier saw the plaintiff grabbing Jackson by the neck and punching her, he notified master control of an assault on an officer and ran to the plaintiff's cell at the top tier. It also is undisputed that by the time he arrived, other inmates were pulling the plaintiff off Jackson and attacking him. Although it is disputed whether the plaintiff was fighting back, a corrections officer "is not required to take the unreasonable risk of attempting to break up a fight between two inmates when the circumstances make it clear that such action would put her in significant jeopardy." *Guzman v. Sheahan*, 495 F.3d 852, 858 (7th Cir. 2007). It therefore was not unreasonable for Ithier not to get involved, if the plaintiff indeed was fighting back. In fact, he was trained not to. As the plaintiff conceded, Ithier did not idly watch the inmates attack the plaintiff. He had already called for backup and left his post to attempt to contain the scene, which at the time involved an inmate fighting an officer. It is undisputed that after the taser incapacitated the plaintiff, Ithier ordered the inmates to

return to their cells and not attack the plaintiff. His actions show he was not deliberately indifferent to the plaintiff's risk of harm from other inmates.

Even if Ithier failed to order the other inmates to stop fighting the plaintiff once he reached the top tier, as the plaintiff testified, that would constitute negligence at most. Negligence is not deliberate indifference and does not violate the Fourteenth Amendment. *See Guzman*, 495 F.3d at 858–59 (concluding that officer who "called for backup and attempted to secure that backup" but did not admonish inmates to stop fighting was at most negligent); *see Fisher v. Lovejoy*, 414 F.3d 659, 662 (7th Cir. 2005) (explaining that deliberate indifference under the Fourteenth Amendment "requires more than a showing of negligent or even grossly negligent behavior").

Construing the facts in the light most favorable to the plaintiff, Ithier's response to the other inmates attacking the plaintiff may have been negligent but it was not deliberately indifferent. Because no reasonable jury could conclude otherwise, I will grant summary judgment for Ithier on this claim.

**D.    Due Process – Lieutenant Stevens**

I allowed the plaintiff to proceed on a claim that Stevens did not provide him notice of the disciplinary hearing and did not allow him to call witnesses or present video evidence. But the plaintiff conceded at his deposition that Stevens was not responsible for providing him notice of the disciplinary hearing and was only responsible for conducting the hearing itself. ECF No. 89-1 at 111:14–24. Because it was not Stevens's duty to provide plaintiff notice of the hearing, he cannot be held liable for not providing it. *See Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009). The only remaining issues are whether Stevens improperly disallowed the plaintiff from watching the video of the incident or calling witnesses during the hearing.

Although the government may not punish a pretrial detainee for the crime with which he is charged before trial, the government may punish him for misconduct that occurs while in pretrial confinement. *Rapier v. Harris*, 172 F.3d 999, 1002–03 (7th Cir. 1999) (citing *Bell v. Wolfish*, 441 U.S. 520, 535 (1979)). Before any such punishment is imposed, the pretrial

detainee must receive "some sort of procedural protection," *id.* at 1005, which includes at least advanced written notice of the disciplinary charges, an opportunity to call witnesses, and a written statement of the evidence relied on, *Higgs v. Carver*, 286 F.3d 437, 438 (7th Cir. 2002) (citing *Rapier*, 172 F.3d at 1004–05); *see also Cooper*, 803 F.App'x at 946.

Even if the plaintiff is correct that Stevens improperly disallowed him from calling witnesses or viewing the video, he fails to show that he suffered any harm from Stevens's actions; that is, he fails to show that the result of the hearing would have been different had he been allowed to see the video or call witnesses. *See Cooper*, 803 F.App'x at 947 (citing *Piggie v. Cotton*, 344 F.3d 674, 677–78 (7th Cir. 2009)) (applying harmless-error analysis for prison disciplinary proceedings to pretrial detainee's due process claims). It is undisputed that the plaintiff told Stevens nothing about the fight; he said he blacked out and could not remember the details. Yet he also never told Stevens that Jackson was the aggressor and initiated the fight. The plaintiff also conceded that none of the three inmates he says he would have called as witnesses—Alex Adams, Tristan Small, and James McCoy—would have supported his version of the events that Jackson struck him first and that he was defending himself. Nor has he submitted an affidavit or statement from any of those three witnesses. He agreed that *no one* has told him they saw the initiation of the fight and saw Jackson strike the plaintiff first.

The plaintiff insists there *may have been* other witnesses that he *could have identified* as having relevant testimony. But the plaintiff cannot create a genuine issue of fact by offering only speculation and conjecture about what hypothetical other witnesses may have said if they offered testimony before or at the hearing. *See Ammerman*, 817 F.App'x at 268; *see also Cesal v. Kruse*, No. 19-2785, 2021 WL 2182322, at *2 (7th Cir. May 28, 2021) (citing *Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016)) (affirming that prisoner's offering of "only speculation and conjecture . . . is insufficient" to reverse district court's grant of summary judgment).

The plaintiff also offers nothing to suggest the result would have changed had he been allowed to view the video before the hearing. The plaintiff again attempts to create a

genuine issue of fact by speculating how the disciplinary hearing may have turned out different if he had been able to see the video beforehand. But as noted, he cannot create a genuine issue of fact by speculating on matters about which he lacks personal knowledge or evidence in support. *See Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003) (citing Fed. R. Civ. P. 56(e) (now Rule 56(c)(4)) and Fed. R. Evid. 602). Stevens swears the video did not contain exculpatory information and did not show who initiated the fight. The plaintiff has not disputed that by pointing to any contrary evidence in the record. In fact, the plaintiff conceded at his deposition that the evidence presented alone was sufficient to support at least four of the five disciplinary charges. He testified that it may not have been enough to support the charges for assault and assault on staff "because they are both similar." ECF No. 89-1 at 139:24–140:3. The plaintiff speculates that he may have been able to identify other witnesses to testify had he been able to watch the video first. But he has since viewed the video and does not propose any additional witnesses or include statements from inmates who had information relevant to his disciplinary charges.

Even if Stevens improperly denied the plaintiff's request to call witnesses or view the video, those errors were harmless. The plaintiff has not provided any evidence suggesting the result of his disciplinary hearing would have been different had he called witnesses or viewed the video of the incident. He does not identify any witnesses who would have supported his version of the events or offered testimony relevant to his disciplinary charges. He has since viewed the video and does not explain what it shows that would have altered his disciplinary charges or punishment. Because no reasonable jury could conclude that Stevens violated the plaintiff's right to due process, I will grant summary judgment to Stevens on this claim.

**E.    State Law Claims**

I allowed the plaintiff to proceed on state law claims of battery against Jackson and Ithier and intentional infliction of emotional distress against all three defendants. The defendants assert that the evidence does not support any of the state law claims against any defendant. But they also assert that the court lacks jurisdiction over these claims

28

because the plaintiff did not properly file a notice of claim before bringing this lawsuit. ECF No. 82 at 50–51.

Under Wis. Stat. § 893.82, an individual bringing a civil action against a state employee must serve written notice of the claim on Wisconsin's attorney general within 120 days of the event giving rise to the action. *See* Wis. Stat. § 893.82(3); *see also* Wis. Stat. § 893.82(3m) (noting that prisoner-claimants may not bring a civil action against a state employee "until the attorney general denies the claim or until 120 days after the written notice . . . is served upon the attorney general, whichever is earlier"). The notice of claim must include "the time, date, location and the circumstances of the event giving rise to the claim for the injury . . . and the names of persons involved, including the name of the state officer, employee or agent involved." Wis. Stat. § 893.82(3). The notice of claim statute is jurisdictional and requires strict compliance. *See Taylor v. Anderson*, No. 19-C-300-JDP, 2021 WL 808648, at *6 (W.D. Wis. Mar. 3, 2021) (citing *Riccitelli v. Broekhuizen*, 595 N.W.2d 392, 399 (Wis. 1999)).

The events underlying this lawsuit occurred from February 9 to 12, 2018. That means the plaintiff had until at the latest June 12, 2018, to file a notice of any state law claims he wished to bring related to those events. It is undisputed that the plaintiff did not file a grievance about the events until September 2018—well beyond the 120-day limit to notify the state of his claims. ECF No. 88-11 at 2. He did not file an official notice of claim with the state until even later, in January 2019. ECF No. 88-10 at 1–5.

The plaintiff asserts that he should be excused from complying with the 120-day deadline because he was diagnosed with anti-social personality disorder at some unspecified time before February 9, 2018. ECF No. 93 at 32; ECF No. 95, ¶ 61. A mental disorder may toll the 120-day limitations period only if it rendered the plaintiff "'functionally unable to understand or appreciate the situation giving rise to the legal claim,' or . . . 'functionally unable to understand legal rights and appreciate the need to assert them.'" *Lewis v. Stamper*, No. 14-CV-446-WMC, 2019 WL 4670194, at *5 (W.D. Wis. Sept. 25, 2019) (quoting *Storm v. Legion Ins. Co.*, 665 N.W.2d 353, 369 (Wis. 2003)). The plaintiff

bears the burden of proving by a preponderance of the evidence that he suffered from this mental condition at the time his claims arose. *Id.*; Wis. Stat. § 893.16.

The plaintiff offers no evidence in support of his assertion that he suffered from a mental defect that prevented him from complying with Wisconsin's notice of claim statute, not even a statement in his affidavit. He merely insists he suffered from a mental defect starting some time before February 9, 2018. Yet the record reveals an inmate who fully understood his situation and legal rights. For example, the plaintiff testified that he was complaining about being attacked immediately after being placed in pod 4D. ECF No. 89-1 at 84:13–14. He testified that learning the identity of the officer who tased him "was big on [his] mind." *Id.* at 84:21–23. He testified that he successfully manipulated the Jail into returning him to Waupun after his fight with Jackson to avoid having to serve his 33 days' disciplinary confinement. *Id.* at 117:15, 142:17–144:8. Nothing in the record suggests he was suffering from a mental disorder that rendered him incapable of understanding his legal situation or rights before or immediately after the fight.

The plaintiff also asserts that he did not know about the specifics of his claims until later, when he saw the video of the incident. ECF No. 93 at 31–32. That argument is frivolous. Whether he knew that Jackson caused specific injuries, such as the cut on his nose, is irrelevant. He knew the day of the fight that he and Jackson exchanged punches, that he suffered injuries, and that Jackson worked for the Jail. Similarly, he testified that he learned from inmate Alex Adams while he was in pod 4D, between February 13 and 15, 2018, that Ithier was the officer who tased him. ECF No. 89-1 at 153:6–23. He testified that he had interacted with Stevens as early as 2014 and knew who he was when he conducted the disciplinary hearing. *Id.* at 96:24–97:7. The plaintiff suggests no reason to believe that within days of the fight or disciplinary hearing, he was unaware of the time, date, location, or circumstances of the events giving rise to his claims, or the names of the persons involved.

The plaintiff does not excuse his failure to strictly comply with Wisconsin's notice of claim statute. His proposed excuses lack evidentiary support and are frivolous. Because the

plaintiff failed to provide requisite notice of his state law claims, I lack jurisdiction over them. I will therefore grant summary judgment for the defendants on the plaintiff's state law claims of battery and intentional infliction of emotional distress.

**F.      Qualified Immunity[9]**

Ithier asserts that, even if the plaintiff's version of the events is true, he is entitled to qualified immunity. Qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Figgs v. Dawson*, 829 F.3d 895, 905 (7th Cir. 2016) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation omitted)). Qualified immunity is an affirmative defense. Once raised, the plaintiff must show that the defendants violated his constitutional right and that the right at issue was clearly established at the time of the violation. *Pearson*, 555 U.S. at 232. As noted, a reasonable jury could conclude that Ithier unreasonably tased the plaintiff when he was no longer resisting. I therefore may grant Ithier qualified immunity only if I conclude that the plaintiff's allegedly violated rights were not clearly established as of February 2018. *See Lewis*, 581 F.3d at 478 (citing *Hill v. Shelander*, 992 F.2d 714, 717–18 (7th Cir. 1993)).

The law is "clearly established" only if "various courts have agreed that certain conduct is a constitutional violation under facts not distinguishable in a fair way from the facts presented in the case at hand." *Figgs*, 829 F.3d at 905 (quoting *Campbell v. Peters*, 256 F.3d 695, 701 (7th Cir. 2001)) (internal quotation marks omitted). "[T]he clearly established law must be 'particularized' to the facts of the case." *White v. Pauly*, 137 S.Ct. 548, 552 (2017) (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). It is not necessary that there be cases "directly on point," but "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* at 551 (internal quotation marks omitted). In other words, I must determine whether "'a reasonable officer would have known that the

---

[9] Because I am granting summary judgment for defendants Jackson and Stevens on the merits, I need not discuss whether they are entitled to qualified immunity.

particular action at issue . . . was unlawful.'" *Lewis*, 581 F.3d at 479 (quoting *Juriss v. McGowan*, 957 F.2d 345, 350 (7th Cir. 1992)).

The plaintiff testified that by the time Ithier reached his cell, he was lying on the ground, covering himself for protection from the other inmates and was not fighting back. He further testified that Ithier did not order him to lay flat on the ground and did not warn him about the taser. If the facts are as the plaintiff testified, a reasonable officer would understand that using his taser to subdue the non-combative and non-resistant plaintiff was an unreasonable use of force. *See Lewis*, 581 F.3d at 479 (holding it was clearly established as of at least 2009 that it was unreasonable to use a taser on a non-resistant, prone inmate without warning). I emphasize that the jury may determine that the facts are as Ithier swears—that the plaintiff was fighting the other inmates and disobeying his orders. But accepting the plaintiff's story for purposes of this decision, I cannot conclude that Ithier is entitled to qualified immunity.

### III. CONCLUSION

**THEREFORE, IT IS ORDERED** that the defendants' motion for summary judgment (ECF No. 81) is **GRANTED in part and DENIED in part**. Summary judgment is **GRANTED** for Officer Jackson and Lieutenant Stevens on all claims. Summary judgment is **GRANTED** for Officer Ithier on the plaintiff's Fourteenth Amendment failure-to-intervene claim but **DENIED** on the plaintiff's excessive force claim.

**IT IS FURTHER ORDERED** that summary judgment is **GRANTED** for all defendants on the plaintiff's state law claims of battery and intentional infliction of emotional distress.

**IT IS FURTHER ORDERED** that defendants Teana Jackson and Michael Stevens are **DISMISSED**. The clerk shall terminate them from the docket.

I will enter a separate order scheduling a status conference to discuss the next steps in this case.

Dated at Milwaukee, Wisconsin this 4th day of August, 2021.

s/Lynn Adelman
LYNN ADELMAN
United States District Judge